**MITCHELL & SPEIGHTS, LLC**
Steven C. Mitchell (AZ Bar No. 009775)
Samuel F. Mitchell
(*pro hac vice* to be submitted)
4854 E. Baseline Road, Suite 103
Mesa, AZ 85206
Tel: (602) 244-1520
Fax: (602) 267-9394
Steve@mitchellspeights.com
Sam@mitchellspeights.com

**Attorneys for Plaintiff Tucson Medical Center**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TUCSON MEDICAL CENTER, a corporation,<br><br>           Plaintiff,<br><br>    v.<br><br>PURDUE PHARMA L.P., *et al*.,<br><br>           Defendants. | No. 4:18-cv-00481-RCC<br><br>**PLAINTIFFS EMERGENCY RESPONSE TO DEFENDANT'S IMPROPER SUPPLEMENTAL NOTICE OF REMOVAL** |

Plaintiff Tucson Medical Center (sometimes referred to as "Plaintiff"), by and through undersigned counsel, respectfully moves to request this Court disregard "McKesson Corporation's Supplemental Notice of Removal" [Doc. No. 2] (the "Supplemental Notice"), and, contemporaneously responds to the arguments made therein, in further support of Plaintiff's Emergency Motion to Remand [Doc No. 1] (the "Emergency Motion to Remand").  For the reasons stated below, the Supplemental Notice should be disregarded.  For the reasons stated below, and in the Emergency Motion to Remand, this action should be remanded to state court.

## I. INTRODUCTION

On August 22, 2018, Tucson Medical Center commenced this action, asserting twelve claims, including two Arizona statutory claims and ten Arizona common law claims, against the Defendants. Tucson Medical Center's claims are based *solely* upon Arizona statutory and common law. Nonetheless, Defendant AmeriSource Bergen, joined by all Defendants, filed a "Notice of Removal" (the "Joint Notice") filed at 6:20 p.m. MST on September 24, 2018, alleging that this action presented a federal question, giving rise to subject matter jurisdiction under 28 U.S.C. § 1331.

*Four hours later*, and less than two hours before the time to remove this action would have expired, McKesson had an epiphany and filed the instant Supplemental Notice. The Supplemental Notice was never served by McKesson, and notice of its filing was not provided to Plaintiff until this Court's electronic filing system notified Plaintiff's counsel at 12:01 PM MST on September 25, 2018. The Supplemental Notice should be stricken.

In the Supplemental Notice, McKesson makes the preposterous argument that is is somehow a "federal agent" because it sold some quantity of opioids to the federal government. McKesson's filing is an act of desperation, based on its evident understanding that the Joint Notice was dead in the water, as the Joint Notice is based on arguments that have been widely, and unanimously, rejected by federal district courts across the country. McKesson cannot seriously believe that the "federal agent" theory is any more viable, and the purpose is obviously to delay the progress of this litigation. But the theory is somewhat novel, and, perhaps, just novel and confusing enough to persuade this Court to punt the issue to the MDL Court, which is exactly what the Defendants want.

On the merits, this theory is frivolous. McKesson relies largely on a decision by the MDL Court concerning cases brought by Indian tribes – which the MDL Court made very clear was limited to the unusual facts in those two cases. Unlike Indian tribes, whose members' health care is closely tied to the federal government, Tucson Medical Center's purchases of opioids, and operations generally, bear little or no relation to federal contracts.

The Court should see through this charade. As discussed in the Emergency Motion to Remand (addressing the Joint Notice), it is the instant and ongoing obligation of any federal district court to evaluate and re-evaluate its subject matter jurisdiction. And it is proper practice for this Court to evaluate its subject matter jurisdiction before any MDL transfer occurs. When a federal court lacks subject matter jurisdiction, it should not simply kick the case to another federal court – it should, and must, remand the action to state court.

Every day delayed means more Arizonan lives consumed by the opioid-epidemic.[1] Every day delayed emboldens Defendant's egregious conduct and argument. Therefore, respectfully, Tucson Medical Center asks this Court move expeditiously and decisively to thwart this cynical coup of our judicial system, and disregard McKesson's supplemental notice and summarily remand this case to Pima County Superior Court.

## II. ARGUMENT

### A. McKesson's Supplemental Notice of Removal Is Procedurally Improper and Should Be Disregarded

Defendant, AmerisourceBergen, in compliance with 28 U.S.C. § 1446(d) and Local Rule 3.6(a) removed this action to this Court at 6:20 p.m. MST on September 24, 2016. AmerisourceBergen effectuated service using the Arizona's electronic docketing system at 6:21 p.m. MST same day.

Defendant McKesson, was a signatory to the AmerisourceBergen's notice and, therefore, knew and understood what the Rules required. However, as evidenced by the record, McKesson violated the Rules *four hours later.* At 10:24 p.m. MST September 24, 2018, when McKesson filed "McKesson Corporation's Notice of Removal using Arizona's electronic filing system. Notice to was not provided to Plaintiff's counsel, until this Court's ECF system provided notice at 12:01 p.m. the next day, September 25, 2018. This Court, *not* McKesson, notified Plaintiff's counsel of an alternative basis for removal. McKesson

---

[1] The opioid epidemic claims the lives of more than two (2) Arizonans per day. *See* Compl. §21.

3

had the same opportunity as AmerisourceBergen to notify Plaintiff's counsel electronically, however, it *chose* not to do so.

This is not an ordinary case, this is a case of generations, as the opioid epidemic affects and consumes the lives of Arizonans every single day. Rules and procedure matter to ensure *all* parties are heard and have the *opportunity and notice* to respond in kind. McKesson violated the rules, McKesson had every opportunity to comply with the rules—just like AmerisourceBergen, who did—but McKesson did not do so. This Court should not condone violation of its Local Rules and should sanction McKesson for violation of this Court's Local Rules in accordance with LRCiv 83.1(f). Inherent in every court is the absolute need to maintain order and preserve the dignity of the court. *Zambrano v. City of Tusin*, 885 F.2d 1473, 1478 (9th Cir. 1989).

As stated in further detail below, McKesson's argument is made *solely* to delay justice. And this Court should exercise its inherent and unchallenged authority to sanction McKesson by striking its Notice of Removal.

### B. McKesson Cannot Remove this Action as a "Federal Officer"

The federal officer removal statute permits removal of a state-court action against an "officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The statute protects federal officers from interference with their official duties through state-court litigation. *See, e.g., Arizona v. Manypenny*, 451 U.S. 232, 241–42 and n.16 (1981). To invoke § 1442(a)(1) removal, a defendant in a state court action must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.' " *Fidelitad, Inc. v. Institu, Inc.*, 2018 WL 4568555, at *3 (9th Cir. Sept. 25, 2018) (quoting *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252–53 (9th Cir. 2006)).

Plaintiff does not dispute that McKesson is a "person" for purposes of § 1442(a)(1), but McKesson does not satisfy the other requirements of § 1442(a)(1) removal. Specifically, McKesson cannot remove because (1) it did not act "pursuant to a federal officer's directions, (2) there is an insufficient nexus between any such actions and plaintiffs' claims, and (3) it cannot assert a colorable federal defense.

### 1. McKesson, a Mere Distributor of Commercial Products, Did Not Follow the Federal Government's Specifications in Making Products or Providing Services

"For a private entity to be 'acting under' a federal officer, the private entity must be involved in 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Fidelitad, Inc.,* 2018 WL 4568555, at *3 (emphases omitted) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)). The "relationship typically involves 'subjection, guidance, or control.'" *Id*. (quoting *Watson*, 551 U.S. at 151). "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 151 (citing *Winters v. Diamond Shamrock Chemical Co.,* 149 F.3d 387, 387 (5th Cir.1998))). The paradigm is a private person acting under the direction of a federal law enforcement officer. *Watson*, 551 U.S. at at 149; *see, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 30(1926) (noting that a private party acting as a federal officers' driver in a distillery raid had "the same right to the benefit of" the removal provision as did the federal agents); *Davis v. South Carolina*, 107 U.S. 597 (1883) (holding that a soldier who killed a distiller during a raid could remove his criminal case because he "lawfully assist[ed]" a revenue officer "in the performance of his official duty"). Basically, a defendant must establish that the government required them to take certain action or, in other words, the defendant must show that "the government made me do it." *Alsup v. 2-Day Blinds, Inc.,* 435 F.Supp.2d 838, 847-48 (S.D.Ill.2006) (citations omitted).

The Sixth Circuit recently noted that, in order to be "acting under" a federal officer,

"a government contractor entitled to removal would presumably be contractually required to follow the federal government's specifications in *making products or providing services*." *Mays v. City of Flint, Mich.*, 871 F.3d 437, 445 (6th Cir. 2017) (emphasis added). McKesson, however, does neither – it does not "make products" to government specifications, nor does it "provide services" to the government. It is nothing more than a distributor of commercial products that it also distributes to civilian purchasers.

First, McKesson does not allege, and cannot allege, that it "provides services" to the VA and IHS. The VA and IHS provide healthcare services. The VA and IHS did not delegate any of their responsibilities to provide such services to McKesson. McKesson does not provide healthcare services to anyone anywhere. In its Notice of Removal, McKesson affirmatively describes itself as a *supplier*:

> By the terms of the PPV Contract, McKesson *supplied and continues to supply prescription medications, including opioids, to the Department of Veterans Affairs and other federal customers nationwide*.

Notice of Removal, at ¶ 19 (emphasis added). As a "supplier," it describes its responsibilities as "processing" and "delivering" orders, including provisions relating to the place of delivery and timing of orders. *Id*. at ¶ 20. But these are nothing more than the logistics of delivering commercial goods, and are not services, much less healthcare services. Indeed, the federal government (like McKesson here) describes the PPV program as a "contract method" for the provision of "drugs and other pharmaceuticals."[2] The closest McKesson comes to suggesting it "provides services" is self-serving language that it "'assist[s]' the government with 'carry[ing] out' the government's activities of distributing pharmaceuticals to its federal health care facilities.'" *Id*. at ¶ 21 (quoting *Watson*, 551 U.S. at 143). But if supplying commercial products to the government was sufficient to constitute "assistance" under *Watson*, any vendor who provided anything to the federal government could avail itself of § 1442(a)(1). Moreover, the VA and IHS are not in the business of "distributing pharmaceuticals" at all. They are in the business of providing

---

[2] https://www.va.gov/opal/nac/ncs/ppv.asp

6

healthcare, and are *buyers* of pharmaceuticals.  McKesson sells pharmaceuticals to the government.  This is not a service, much less a service that was delegated to McKesson by the government, since the government is not in the business of *selling pharmaceuticals to itself*.

Second, a mere supplier of commercial goods cannot plausibly be deemed to "make products" to "the federal government's specifications."  No doubt, many providers of goods to the federal government do fall within the scope of § 1442(a)(1).  But it is not simply enough to provide products to the federal government to be "acting under" the direction a federal officer – the question is whether the products are *made to government specifications*.  *See Winters,* 149 F.3d at 392 (in what the court described as a "close" case, sales of toxic agent to the government were "under direction" of the government only because the alleged deadly properties of the product "resulted from the particular mixture of the component chemicals that the government dictated").  Where a vendor simply sells commercial goods to the government, however, it is not "acting under" a federal officer. *Megill v. Worthington Pump, Inc.*, 1999 WL 191565, at *2, 5 (D. Del. Mar. 26, 1999) (remanding case where "there is no evidence of record that Worthington's commercial products (which comport with commercial specifications) in any way deviated from the products sold to the Navy (which comported with military specifications)").

Here, McKesson, does not "make products" *at all*, and the products it distributes are simply commercial products that it distributes widely to civilian purchasers.   McKesson does not contend anywhere within its Notice of Removal, and cannot contend, that it made anything, or even distributed any product, that was made to government specifications.  The undersigned are not aware, and McKesson has not cited, any cases applying § 1442(a)(1) to manufacturers (much less to mere distributors) of ordinary commercial goods that are *not* made to government specifications.

On this issue, Plaintiff respectfully disagrees with the recent decision rendered by the MDL Court, relied upon heavily by McKesson. *In re National Opiate Litig.,* 2018 WL

7

4203535 (N.D. Ohio Sept. 4, 2018).  The MDL Court was persuaded that McKesson's role in the logistics of distributing pharmaceuticals provided sufficient "assistance" to the government for it to avail itself of § 1442(a)(1).  But supplying commercial goods has never previously been held by any court to constitute a "service" performed under government direction.  The MDL Court's heavy reliance on *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 (6th Cir. 2010) was misplaced, as that case involved a service contract (mold remediation at airports) with detailed specifications.  McKesson is a supplier of goods, not services, and the goods are off-the-rack commercial products.  The PPV contract does not change that, and only specifies price and logistical arrangements for placing and fulfilling orders of those commercial goods.  McKesson's role as a provider of commercial goods is a far cry from the paradigm of a private contractor serving as a law enforcement officer in a distillery raid.  *see, Maryland*, 270 U.S. at 30.

## 2. There is an Insufficient "Causal Nexus"

Since McKesson was not "acting under" a federal officer, there can be no causal nexus *at all* between its actions under the direction of a federal officer and the harm suffered by Tucson Medical Center.  But even assuming for the sake of argument that, in conducting its PPV sales, McKesson was "acting under" a federal officer, those sales constitute an insignificant percentage of its sales, and McKesson cannot plausibly allege that the government pushed it into the opioid business.

### a) There is an Insufficient "Causal Nexus" Between McKesson's PPV Sales (Which Constitute Less than 2% of Its Sales), and Plaintiff's Injuries

In its Notice of Removal, McKesson suggests that $4 billion in sales under the PPV Contract is an astronomical figure.  But McKesson (a publicly traded company that publicly discloses its financial results with the Securities and Exchange Commission) fails

to point out that it recently announced that its total annual sales (FY 2018) were $208 billion.[3] McKesson's sales under the PPV, then, amount to less than 2% of its total sales.

The vast majority of cases successfully removed under § 1442(a)(1) involved goods specially made, and/or services provided, strictly[4], or at least primarily[5], under government contracts and precise government specifications. Here, that is clearly not the case.

McKesson does *not* appear to argue that it can avail itself of § 1442(a)(1) if "any" quantity of opioids were distributed under the PPV program. Rather it argues that a

---

[3] *See* "McKesson Reports Fiscal 2018 Fourth-Quarter and Full-Year Results," May 24, 2018, available online at
https://www.mckesson.com/about-mckesson/newsroom/press-releases/2018/mckesson-reports-fy2018-4th-quarter-and-full-year-results/

[4] *See e.g. Thrash v. Cirrus Enterprises, LLC*, 2017 WL 2645499, at *2 (N.D. Cal. June 20, 2017) ("Because Plaintiffs contend that Mr. Thrash was exposed to asbestos through the use of asbestos-containing products and/or components designed or manufactured by Defendants, and because Defendants have established that the United States government exerted direct and detailed control over their design and manufacture of these products, the Court further finds that Defendants have established a causal nexus between Plaintiffs' claims and the acts performed by Defendants under the direction of the United States government.")(citing *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014)); *In re "Agent Orange" Product Liability Litigation*, 304 F.Supp.2d 442, 447 (E.D.N.Y. 2004) (finding that the government had exercised a "substantial degree of direct and detailed federal control over the defendant's work" by "maintain[ing] strict control over the development and subsequent production of Agent Orange." (quoting Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 399 (5th Cir. 1998)); *Burdett v. CBS Corp.*, 2017 WL 6514649 (C.D. Cal. Dec. 20, 2017) ("Here Alcatel alleges that the warnings that accompanied its products were subject to government specifications and requirements, not merely government approval.").

[5] *See e.g. Leite v. Crane Co.,* 749 F.3d 1117, 1124 (9th Cir. 2014); *McMann v. Air & Liquid Sys. Corp.*, 2014 WL 1794694 (W.D. Wash. May 6, 2014) ("Such a causal nexus clearly exists here, as the acts that form the basis of Plaintiffs' claims—use of asbestos and failure to warn about asbestos-related hazards—are acts that Westinghouse and Crane contend they performed at the direction of the Navy and while performing their government-prescribed duties."); Goncalves ex rel. Goncalves v. Rady Children's Hosp. San Diego, 865 F.3d 1237, 1249–1251 (9th Cir. 2017) ("Although at first glance it may appear that the Blues are operating as private insurance companies divorced from federal officers, a review of OPM's oversight and directives, FEHBA's comprehensive federal program, and the Blues' role in it belies that contention.a review of OPM's oversight and directives, FEHBA's comprehensive federal program, and the Blues' role in it belies that contention.").

9

"*substantial portion* of the quantities and frequency of the prescription opioids distributed by McKesson in southern Arizona" were subject to the PPV. *Id*., ¶ 24 (emphasis added). But, having told this Court that the value of the PPV business is $4 billion, and having told the SEC that its total sales are $208 billion, it is stuck with a figure of under 2%. That is not particularly "substantial."

### b) The Cases Brought by Indian Tribes are Inapposite

McKesson relies heavily on the MDL Court's finding that there was a sufficient "causal nexus" alleged by McKesson, in removing certain cases brought by Indian tribes, where the plaintiff[s'] complaint[s] "put *all* prescription opioids at issue . . . including those opioids supplied pursuant to the PPV contract." Notice of Removal, ¶ 25 (citing MDL Court order, at 17).

But it is not a fair reading of the MDL Court's order to construe it as holding that *any* quantity of government sales would bring McKesson within the ambit of a statute designed to protect persons performing government functions. McKesson, notably, ignores the last two paragraphs of the MDL Court's Order, in which it emphasizes that the claims presented by the Indian tribes were "a close case" and that it "***construes McKesson's removal arguments very narrowly as applicable only to the specific facts of these two cases***." 2018 WL 4203535, at *10 (emphasis and extra emphasis added).

Indeed, the MDL Court found particularly persuasive certain of the unusual circumstances pertaining to the provision of medical services and supplies to Native American populations, noting that "McKesson argues, it helps the VA (and IHS) carry out their duties of providing prescription drugs to the Cherokee Nation and the Lac Courte Oreilles Band of Lake Superior Chippewa Indians."

The MDL Court also found it to be significant that there were already 51 actions brought by Indian tribes pending before it, that remand was only being sought in two (2) of those actions, and that the other actions were either originated in federal courts or removal was not contested. *Id.* at *10.

As noted by the MDL Court, the Indian Health Service is *a party* to the PPV – one of a select group of federal agencies with such status.[6]  Broad segments of the Native American population, particularly those residing on tribal lands or otherwise active in tribal affairs, are entitled to healthcare services provided by IHS.[7]  The same cannot be said for the general population of Metropolitan Tucson, nor of the general American public.

---

[6] The VA states, on its website, that "[i]n addition to VA, other Federal Government customers eligible to use VA's prime vendor contracts are *U.S. Public Health Service (Indian Health Service)*, Bureau of Prisons and the Immigration and Naturalization Service.  Authorized State Veterans Homes that have sharing agreements with VA facilities also are eligible to use the contract." https://www.va.gov/opal/nac/ncs/ppv.asp (emphasis added).

[7] The "Indian Health Manual published by IHS provides, in pertinent part:
  2-1.2 PERSONS ELIGIBLE FOR IHS HEALTH CARE SERVICES.  A person may be regarded as eligible and within the scope of the IHS health care program if he or she is not-otherwise excluded by provision of law, and is:
    A. American Indian and/or Alaska Native.  American Indian and/or Alaska Native (AI/AN) descent and belongs to the Indian community served by the IHS program, as evidenced by such factors as:
      1. Membership, enrolled or otherwise, in an AI/AN Federally-recognized Tribe or Group under Federal supervision.
      2. Resides on tax-exempt land or owns restricted property.
      3. Actively participates in tribal affairs.
      4. Any other reasonable factor indicative of Indian descent.
      5. In case of doubt that an individual applying for care is within the scope of the program, as established in 42 C.F.R. § 136.12(b), and the applicant's condition is such that immediate care and treatment are necessary, services shall be provided pending identification as an Indian beneficiary.
See Indian Health Manual, at §2-1.2, available online at https://www.ihs.gov/IHM/pc/part-2/p2c1/

McKesson concedes, even in its Supplemental Notice, that cases were special because they related to "McKesson's PPV distributions to the Indian Health Service." *See* Supplemental Notice at ¶ 17. McKesson has pointed out in its successful moving papers (in the Tribal cases) that the "PPV Contract obligates McKesson to supply prescription medications to Tribal facilities when they are ordered by the [IHS] through the PPV Contract and likewise to supply the VA facilities in and around the Tribal Area," and further quoted a declaration filed by an opposing party in which it was stated that "[i]n recent years, the majority of the prescription medicine dispensed or administered at Cherokee Nation health facilities is supplied by McKesson Corporation." "Defendants' Response in Opposition to Plaintiff's Motion to Remand," [Doc No. 29] in 1:18-op-45695-(N.D. Ohio Mar. 15, 2018), at 3.

Unlike the Indian tribes or IHS, Tucson Medical Center is not a party to the PPV, and does not purchase any pharmaceuticals through the PPV. Plaintiff is a non-profit hospital unrelated to the VA or the federal government. Plaintiff does not allege that it is a "federal customer" that McKesson contracted with through the PPV method. Further, Plaintiff's business is not implicated by any of the terms that McKesson had with "federal customers" through the PPV method. Tucson Medical Center's injuries, like those alleged by state attorneys' general and municipalities, are derived from the broad distribution of opioids into the general population, and have no particular relationship to the VA,[8] IHS or any other specific federal nexus.

Notably, the MDL Court further stated that the grounds for removal of the case brought by the Indian Tribes would *not* also apply to actions alleging state law claims brought by state attorneys general. 2018 WL 4203535, at *10. But if the MDL Court's reasoning is extended here as requested by McKesson, that is precisely what *will* happen –

---

[8] In addition, without any showing of evidence that is certainly in its possession, McKesson argued that plaintiff's allegations "disproportionately" included veterans. *See* Supplemental Notice, at ¶ 9. But Plaintiff made no such allegation, and McKesson provides nothing more than a conclusory statement.

12

if the sale by McKesson of *any quantity* of opioids through the federal/PPV sales channel renders it a "government agent," it can and will remove any state law action arising out of the Opioid crisis. State attorneys general and municipal plaintiffs will be equally susceptible to removal of their cases, as their claims, like Tucson Medical Center's, arise from the totality of the Defendants' conduct, which likely includes some modest volume of sales to the federal government.

### 3. McKesson Has No Colorable Federal Defense.

McKesson argues that it has two colorable federal defenses: (1) the "federal contractor" defense, and (2) preemption. It is mistaken.

The government contractor defense fails under controlling Ninth Circuit law. "In the Ninth Circuit, … [the government contractor defense] is only available to contractors who design and manufacture military equipment." *Cabalce v. Thomas E. Blanchard & Associates, Inc.*, 797 F.3d 720, 731 (9th Cir. 2015) (quoting *Snell v. Bell Helicopter Textron, Inc.,* 107 F.3d 744, 746 n. 1 (9th Cir.1997) (citation omitted)). It would also fail because the product provided by McKesson (pharmaceuticals) is a commercial product not made pursuant to any government specifications, and, even if the defense were extended to nonmilitary service contracts (as it has been in the Sixth Circuit, in *Bennett*, *supra*), McKesson has not provided any "services" and is merely a supplier of commercial products.

The preemption defense also fails. McKesson does not appear to argue complete preemption, a matter that has been settled by the express language of the CSA itself, as the CSA contains a provision that explicitly indicates that Congress did not intend for the CSA to preempt state law "unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together." 21 U.S.C. § 903. Any defense of conflict preemption fails, too. Courts have repeatedly rejected attempts by pharmaceutical companies to evade liability under state laws that may impose requirements more stringent than, or different (but not in conflict) with, those

imposed by federal regulatory schemes. *See e.g. Wyeth v. Levine*, 555 U.S. 555 (2009) (state law claims concerning labeling not preempted); *In re Opioid* Litigation, 2018 WL 3115102 (Sup. Ct. Suffolk Co., N.Y. June 18, 2018) (state law claims arising from opioid crisis not preempted). Here, in fact, the Defendants themselves (in their joint Notice of Removal) have already taken the position that this case is based at least in part on federal standards, Joint Notice, at ¶ 7, and tout the fact that at least some of the Arizona laws at issue *incorporate* federal standards, *Id.* ¶ 21, which renders implausible any notion that they could be in *conflict* with federal standards. It is particularly distasteful that, at 6:20 p.m. on September 24, 2018, McKesson joined a statement that this is a case based on federal standards, and then at 10:24 p.m., asserted that it has a defense that Arizona law conflicts with those standards.

### III. CONCLUSION

Defendant's argement is novel but unpersuasive. It is wholly inapposite to the law, facts and reason. Defendant's argument that it is a federal officer is akin to stating that *anyone* who assists the United States Government in *any* task may anoint themselves a federal officer for purposes of § 1442(a)(1). Therefore, the Court should see Defendant's argument for what it is - procudural gamesmanship in effort to delay this significant public issue to the Great State of Arizona - and expeditiitiously remand this case to Pima County Superior Court.

DATED this 26th day of September, 2018.

Respectfully Submitted,

/s/ *Steven C. Mitchell*
Steven C. Mitchell (AZ Bar No. 009775)
**MITCHELL & SPEIGHTS,** LLC
4854 E. Baseline Road, Suite 103
Mesa, AZ 85206
Tel: (602) 244-1520

Fax: (602) 267-9394
steve@mitchellspeights.com
sam@mitchellspeights.com

Linda Singer
(*pro hac vice* to be submitted)
**MOTLEY RICE LLC**
401 9th Street NW
Suite 1001
Washington, DC 20004
Tel: (202) 386-9626
Fax: (202) 386-9622
lsinger@motleyrice.com

John W. ("Don") Barrett
(*pro hac vice* to be submitted)
P.O. Box 927
404 Court Square North
Lexington, MS 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September 2018, I caused the foregoing document to be filed with the Clerk of this Court via the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ *Steven C. Mitchell*_____
Steven C. Mitchell